**Mary WARING, Plaintiff,**

v.

**FORDHAM UNIVERSITY, Defendant.**

**No. 83 Civ. 4606 (PNL).**

United States District Court, S.D. New York.

Feb. 9, 1986.

Eisner & Levy, P.C., New York City, for plaintiff; Eugene G. Eisner, Fanette Pollack, of counsel.

Rogers & Wells, New York City, for defendant; Margaret Blair Soyster, of counsel.

## OPINION AND ORDER

LEVAL, District Judge.

This is a diversity action. The plaintiff, Mary Waring, a former teacher at Fordham University, alleges that her denial of tenure violated the University's established policies and procedures and was, in addition, motivated by unlawful discrimination against her illness, tinnitus, in violation of N.Y.Exec.Law § 296 (McKinney's 1982). The defendant denies any wrongdoing and moves for summary judgment on all six remaining counts of the complaint.[1] The plaintiff opposes this motion, and cross-moves for summary judgment on the four contract counts. Defendant's motion is granted as to all counts.

**Background**

The history of Mary Waring's employment at Fordham University was complicated, but undisputed in all material respects.

Plaintiff joined the faculty at defendant's Graduate School of Social Service (the School) at the start of the 1977–78 academic year. In the Fall of 1978, early in the second year of her teaching at Fordham, she requested and was granted medical leave for the remainder of the year. Plaintiff was then acutely suffering from what was later diagnosed as tinnitus, or, ringing in the ears. Shortly after her leave began, the School granted plaintiff a reappointment for the following year, 1978–79. In October 1979, after plaintiff's return to the full-time faculty of the School, the School's tenured faculty voted against recommending plaintiff for reappointment for the 1980–81 academic year. The Dean of the School, Mary Ann Quaranta, concurred in this negative evaluation. Nevertheless, in March 1980, the University administration offered the plaintiff a one-year reappointment. Plaintiff accepted this reappointment, and shortly thereafter instituted grievance proceedings on the "issue of whether [she] was given adequate consideration for reappointment." (D.Ex.S) The Tenure and Reappointment Appeals Committee (TRAC) denied plaintiff's appeal.

In July 1981, in order to ensure that plaintiff received at least one year's notice of termination as well as have an opportunity to apply for tenure, the University once again extended to plaintiff a one year reappointment. Early in the next Spring semester plaintiff applied for tenure. On February 22, 1982, the Tenure Committee of the Graduate School of Social Service considered the tenure applications of three candidates: Pauline Zischka, Thomas Hopkins, and the plaintiff. All three professors were recommended for tenure by the Committee and subsequently by Dean Quaranta. Of the three candidates, plaintiff received the fewest affirmative votes.

Fordham University policy attempts to maintain a balance between tenured and non-tenured faculty by limiting the proportion of tenured faculty in any School or Department to sixty percent[2]. In "rare cases and for compelling reasons"[3] the University Tenure Review Committee (UTRC) is permitted to approve the grant

---

**1.** A seventh count alleging intentional infliction of emotional distress was dismissed by stipulation of the parties.

**2.** This policy is set out in Art. 6.4(b) of the University Statutes. This section reads, in relevant part:

... It is desirable that there be sufficient tenured faculty in each Department or school to provide stability and direction for that unit. A number of non-tenured faculty positions, however, should also be maintained in order to retain an ability to adapt to changing needs throughout the Schools of the University. In order to attain these objectives, it is the policy of the University that the tenured faculty of a Department or School should not constitute more than sixty (60) percent of the full-time faculty positions in the unit. In extraordinary circumstances (see Article 6.6g), the proportion of the tenured faculty may exceed sixty (60) percent.
(D.Ex.A)

Article 6.6(g), referred to in the provision, mandates that all recommended tenure appointments that would exceed the 60% policy be sent to the UTRC.

**3.** Art. 6.6(g).

of tenure in excess of the sixty percent ceiling. Because granting tenure to the three candidates recommended by the School's Tenure Committee and Dean in 1982 would have resulted in the School's being more than sixty percent tenured, the Vice President for Academic Affairs referred all three cases to the UTRC to determine whether any "compelling reasons" existed to grant tenure. The UTRC concluded that none of the cases presented compelling justification for tenure and consequently recommended to the President that tenure be denied in each case.[4] Upon this recommendation, the President informed the three candidates in May 1982 that their applications for tenure had been denied.

Over the summer of 1982, plaintiff and Dr. Zischka filed separate appeals with TRAC.[5] While her appeal was pending, plaintiff was given an appointment as an adjunct faculty member despite University policy that a grievance proceeding not affect the date of termination.[6] TRAC determined that insufficient attention had been paid to the possibility of ranking the professors and recommended that the three applications for tenure be remanded to the UTRC. After the UTRC declined to reconsider, TRAC recommended that the two cases on appeal be remanded to the Tenure Committee. The President included Dr. Hopkins' application and remanded all three applications to the School (D.Ex.K). In January 1983 when the Tenure Committee met, they understood that there were two positions available within the sixty percent guideline. The School reconsidered the three applications, unanimously approved Dr. Zischka for tenure, narrowly approved Dr. Hopkins, and recommended against tenure in the plaintiff's case. According to the Chairwoman of the Tenure Committee, the Committee was primarily concerned with plaintiff's "deficiencies in relationship skills", a problem considered especially acute since these skills are "taught as part of the School's curriculum." (Dermody aff'd) Dean Quaranta concurred in the Tenure Committee's recommendations with respect to plaintiff, noting "reservations about interpersonal relationships." (D.Ex.M)

In March 1983, plaintiff was notified by the University that she would not be receiving tenure. In June she instituted the present action alleging that defendant's handling of her tenure application violated University Statutes and thus was in breach of contract, and reflected unlawful discrimination against her because of her physical disability (tinnitus).

**Discussion**

I.

◼ Plaintiff's contract claims, set forth in the first four counts of the complaint, rest on her reading of the University Statutes and her perception of administrative precedent. None of the claims are meritorious, and all can be disposed of on summary judgment.[7]

Count One alleges that defendant University's system of tenure quotas is inconsistent with the "1940 Statement of Principles" of the American Association of University Professors (AAUP) which the University has adopted (Art. 6.3(a)). Without resolving the quibbling over whether the defendant's sixty percent policy amounts to a quota, plaintiff's claim is patently false. Nothing in the "1940 Statement" precludes the use of tenure quotas (D.Ex.A), and nothing in the defendant's adoption of that statement can be construed, as the plaintiff suggests, as binding defendant to a later, 1973 Statement by the AAUP opposing such quotas. The fact that the AAUP views the latter Statement as "a logical

---

4. In choosing not to exceed the sixty percent limit, the UTRC noted that four more candidates were to be considered by the School in the following two years and that neither the creation of new positions nor retirements were likely to ease the tenure situation in the School (D.Ex.D.).

5. Dr. Hopkins accepted a visiting professorship in Africa, took a leave of absence from Fordham, and did not prosecute an appeal.

6. Art. 10.5(d)(6).

7. Both parties agree that there are no facts in dispute with respect to the first four counts.

corollary" of the 1940 Statement (Kurland Aff.) is simply irrelevant to plaintiff's contractual rights.

Plaintiff next contends that since approval of her tenure application alone would not have implicated the 60 percent policy, it was a violation of University Statutes to refer her case to the UTRC. This argument requires an implausible reading of the relevant University provisions (Arts. 6.6(g), 11.14(a))[8] and runs directly contrary to the University's consistent interpretation (Reiss Aff. ¶¶ 12–13; D.Ex.K.). The defendant's sixty percent policy would be entirely undermined if each applicant involved in a multiple tenure decision possessed the right to be considered in isolation with respect to the tenure ceiling. This cannot be seen as a breach of contract.

The third count alleges that Dr. Hopkins' failure to appeal mooted any issues raised by the sixty percent policy and required an automatic grant of tenure to plaintiff. This claim fails because it distorts the sequence of events and underestimates the authority of the President under the University Statutes. Before the question of appeal to TRAC arose, the UTRC recommended that none of the applicants receive tenure (D.Ex.D). Under the University Statutes, such a finding "ordinarily shall be determinative of the ultimate decision to award or deny tenure." (Art. 6.6(g)) Accordingly, at the time of appeal no favorable tenure decision was still in force.[9] Moreover, Dr. Hopkins' application was not moot at all. The University Statutes allow for the Vice President, and by implication the President, to make his own evaluation and, if he deems it appropriate, to request a formal reconsideration (Art. 6.6(i) & (j)). That is what happened. Thus neither the circumstances nor the process existed which would have automatically transformed the UTRC's negative recommendation into a grant of tenure to plaintiff, despite Dr. Hopkins' failure to appeal.

Plaintiff's final contract claim is that the *de novo* reconsideration of her application was in violation of University Statutes. This claim is perhaps the most baffling of all. After the remand to the School for further consideration and possible ranking of the candidates, it is not clear how the plaintiff would have preferred the Tenure Committee to proceed. Indeed, I fail to see how the school could begin to rank the three candidates without addressing their merits. Furthermore, plaintiff stood only to benefit from *de novo* review since her application had received the fewest positive votes of the three considered in 1982 (D.Ex.B).

As a matter of law, giving plaintiff the benefit of any inferences that may be drawn from the evidence, she has failed to show any violation of the University Statutes or established procedures. Her contract claims are dismissed.

## II.

Plaintiff's remaining claims accuse the University of discrimination against her by reason of her illness in violation of N.Y.Exec.Law § 296(1)(a) (McKinney's 1982). After full discovery, in response to a motion for summary judgment, plaintiff has failed to show any substantial proof of such discrimination. What she has shown is merely that she suffered from tinnitus—ringing in the ears—and that she was denied tenure. The charge of discrimination is supported only by her accusation and not by evidence. To the contrary, the evidence demonstrates that the University bent over backwards to extend procedural accommoda-

**8.** Plaintiff's argument in Count Two also ignores the fact that the University Statutes grant the Vice President for Academic Affairs the power to refer cases to the UTRC wholly independent of the sixty percent policy (Art. 11.14(a)(1)).

**9.** Plaintiff seeks to make much of the fact that the UTRC mistakenly believed that only one tenured position was available below the sixty percent ceiling. It should be remembered, however, that the UTRC recommended denying tenure to *all three* applicants. There is no reason to believe that their determination would be any different if they had realized that there were two, rather than one, positions available. Indeed, the UTRC expressly disclaimed any interest in distinguishing between the three candidates (D.Ex.G).

tions to plaintiff, allowing her every advantage in pursuing her application for tenure.

Favorable action on her application and the others simultaneously presented would have exceeded the tenure quota. No compelling reason was shown or found for exceeding the University's quota in her case. Among the factors supporting the ultimate denial were plaintiff's "dearth of relational skills" and doubts of her ability to collaborate harmoniously with colleagues. (D.Exs.L & M; Dermody Aff. ¶¶ 5–6). These considerations are of particularly strong concern given that the award of tenure at Fordham guarantees continuous appointment until the faculty member reaches seventy years of age. (*Fordham University Statutes*, Arts. 6.1, 6.8). Plaintiff contends these complaints about her difficult personality were merely "pretexts," masking the discriminatory intent. (Waring Aff. ¶¶ 67–68) Absolutely nothing is shown to support this assertion. "[S]tatements of peer judgments as to departmental needs, collegial relationships and individual merit may not be disregarded absent evidence that they are a facade for discrimination." *Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir.1984).

Plaintiff also seeks to make much of the fact that she was excluded from committee assignments during the 1982–83 academic year, and thus prevented from demonstrating her abilities and quashing any false notions of her personality. (Waring Aff. ¶¶ 65, 75) As Dean Quaranta explains, however, adjunct faculty are generally excluded from committee assignments, with the exception of one committee for which plaintiff was ineligible. (Quaranta Reply Aff. ¶ 8)

Finally, plaintiff claims that the denial of her tenure application was in retaliation for her complaining of discrimination and threatening to file a complaint with the Department of Labor in 1981. While plaintiff indeed complained of discrimination and prepared to file a complaint (which she never did), no evidence links these events with her denial of tenure. Again, the record reflects an accommodating rather than discriminatory attitude by the University: granting medical leave, reappointing plaintiff while she was on leave, administratively reappointing her for two subsequent years, and then appointing her as an adjunct faculty member pending the resolution of her appeal. Plaintiff's allegations of discrimination are simply unsupported.

Although courts are often reluctant to grant summary judgment where a party's state of mind is at issue, summary judgment is certainly appropriate where a plaintiff has failed to show any evidence to support her accusations that the University discriminates against persons suffering from tinnitus.

Discrimination claims present special problems, furthermore, in the area of faculty appointments in universities. Courts have of course recognized that constitutional and statutory law banning discrimination applies to universities as well as other employers and that universities are not immune from suits to enforce the rights of the historically disadvantaged beneficiaries of such statutes. On the other hand, courts recognize real limitations on their competence to review and pass on the evaluative processes of institutions which necessarily rely on subjective evaluations of the candidate's scholarship and teaching, as well as personality. Academic independence also is threatened when courts pass on the justifications for appointments. Judge Moore observed that "[o]f all fields which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision." *Faro v. New York University*, 502 F.2d 1229, 1231–32 (2d Cir.1974).

In *Lieberman v. Gant*, 630 F.2d 60, 60 n. 1 (2d Cir.1980), Judge Friendly further questioned whether either colleges or courts could survive if every disappointed candidate received a full trial, re-evaluating every stage of the evaluation process. Such trials would at the very least require judges or juries to appraise the candidate's scholarly writings, decide whether they contributed original thought to the disci-

pline, evaluate their thoroughness and reliability, and compare their work to the work of competitors as a part of the assessment of the motives of the decision making committees. When the court undertook such an exercise to appraise the complaint in *Lieberman v. Gant,* fifty-two trial days were consumed before plaintiff's unjustified claim could be set to rest.

Courts today are seriously overburdened. Their ability to do their job of giving justice in bona fide disputes requires that they not waste their scarce resources over insubstantial claims. Of course, summary judgment must not be casually granted and may not be awarded if there is a "genuine issue as to any material fact." Fed.R.Civ.P 56(c). But where there is none, and it is clear that the moving party is entitled to judgment as a matter of law, courts undermine their capacity to render justice if they deny summary judgment in overcautious conservatism.

For all these reasons, courts must be vigilant in weeding out frivolous claims of disgruntled candidates. Summary judgment can be effective in protecting universities from the punishing costs of such litigation. It should not be avoided by "the mere incantation of [discriminatory] intent...." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985); *see also Nash v. Jacqueline Cochrane, Inc.,* 548 F.Supp. 676, 678 (S.D.N.Y.1982) (Weinfeld, J.).

Plaintiff has no support for her charge. Fordham University's motion for summary judgment is granted.

SO ORDERED.